# Richmond

EPPA HUNTON, IV, EXECUTOR OF THE ESTATE OF EPPA
HUNTON, JR. v. COMMONWEALTH OF VIRGINIA.

January 16, 1936.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Chinn
and Eggleston, JJ.

The opinion states the case.

*Eppa Hunton, IV,* and *E. Randolph Williams,* for the plaintiff in error.

*Abram P. Staples, Attorney-General, W. W. Martin, Assistant Attorney-General,* and *Henry R. Miller, Jr.,* for the Commonwealth.

EGGLESTON, J., delivered the opinion of the court.

Eppa Hunton, IV, as executor of the estate of Eppa Hunton, Jr., deceased, filed his petition in the court below asking relief from three alleged erroneous assessments for State taxes made against Eppa Hunton, Jr., during his lifetime, upon income omitted by him from his tax returns for the years 1928, 1929, and 1930.

The omitted items of income were dividends upon shares of stock issued by railroad and power companies which Mr. Hunton claimed were exempt from State income taxes.

The State Tax Department, taking the view that such dividends were taxable, on December 29, 1931, assessed Mr. Hunton with income taxes in the sum of $572.58 on dividends amounting to $19,086 received in 1927. On July 19, 1932, it assessed him with income taxes amounting to $682.59 on $22,753 of dividends received in 1928, and $735.81 taxes on $24,527 of dividends received in 1929.

It is admitted that for each of the four years, 1926-1929, each of the companies from which the dividends were received was assessed with and paid the annual State franchise tax, and other taxes required of it, by sections 176, 177 of the Constitution of Virginia, and sections 216 and 229 of the Tax Code of Virginia (Acts 1928, ch. 45, pp. 145, 159), providing for the taxation of railroads and power companies.

The case presented no issues of fact, and the questions of law before the lower court were the same as those here raised by the assignments of error. The trial court decided these in favor of the Commonwealth, upheld the validity of the assessments and entered an order denying the relief prayed for and dismissing the petition. The matter is here for review on a writ of error awarded by one of the justices of this court.

The assignments of error challenge the correctness of the judgment of the lower court in the following language:

"*First:* Petitioner contends that, under the provisions of section 177 of the Constitution of Virginia and section 28 of chapter 576 of the Acts of Assembly of 1926, now section 216 of the Tax Code of Virginia, providing for the assessment of franchise tax upon railroad companies, and section 170 of the Constitution and section 36½ of chapter 576 of the Acts of Assembly of 1926, now section 229 of the Tax Code, under which franchise tax has been levied upon railroads and other public service corporations, in

which it is provided that the said franchise tax 'shall be in lieu of all taxes or license charges whatsoever upon the franchise of such corporation, the shares of stock issued by it and upon all its property * * *,' the income derived from said shares can not be taxed because a tax levied on the income is a tax on the shares, and that a tax on income is a tax on the property or source from which the income is derived, if the source be not subject to tax the income cannot be.

"*Second:* That, as to the assessment sought to be made by the Department of Taxation December 29, 1932, upon income received during the year 1927, and as to the assessment sought to be made by the Department of Taxation July 19, 1932, upon the dividend or income received during the year 1928, the Department of Taxation is without authority to make the same as section 418 of the Tax Code under which the assessments were sought to be made provides for an assessment of omitted taxes 'for any tax year of the three tax years last past' and not for four years. That the tax levied December 29, 1931, was upon income received in 1927, and that the levy sought to be made in July, 1932, was upon income received in 1928, in each case was for periods beyond the three tax years last past.

"In other words, the Department of Taxation, without authority, has undertaken to assess alleged taxable income beyond the 'three tax years last past.' "

The two assignments will be considered in the order named.

The pertinent portion of section 170 of the Constitution, which was not affected by the amendment of 1927, is as follows:

"The General Assembly may levy a tax on incomes in excess of six hundred dollars per annum; may levy a license tax upon any business which cannot be reached by the *ad valorem* system; and may impose State franchise taxes, and in imposing a franchise tax may, in its discretion, make the same in lieu of taxes upon other property, in whole or in part, of a transportation, industrial, or com-

mercial corporation. *Whenever a franchise tax shall be imposed upon a corporation doing business, in this State, or whenever all the capital, however invested, of a corporation chartered under the laws of the State, shall be taxed, the shares of stock issued by any such corporation shall not be further taxed. * * *"* (Italics supplied.)

The amendments of 1928 to section 177 of the Constitution are not material on the question here involved. That section is:

"Every such railway or canal corporation shall also pay an annual State franchise tax to be prescribed by law, upon the gross receipts hereinafter specified in section 178, for the privilege of exercising its franchises in this State, *which, with the taxes provided for in section 176, shall be in lieu of all other taxes or license charges whatever upon the franchise of such corporation, the shares of stock issued by it, or upon its property assessed under section 176;* provided, that nothing herein contained shall exempt such corporation from the annual fee required by section 157 of this Constitution, or from assessments for street and other public local improvements authorized by section 170; and, provided, further, that nothing herein contained shall annul or interfere with or prevent any contract or agreement by ordinance between street railway corporations and municipalities, as to compensation for the use of the streets or alleys of such municipalities by such railway corporations." (Italics supplied.)

So far as they are here material, the provisions of both sections 216 and 229 of the Tax Code are the same as those of the corresponding statutes in force for a number of years prior thereto.

Section 216 of the Tax Code (Acts 1926, ch. 576, p. 983; Acts 1928, ch. 45, p. 145), after having provided for the taxation of real and personal property (tangible and intangible) of railway and canal corporations, reads:

"Every such railway or canal corporation shall pay to the State an annual State franchise tax for each calendar year equal to one and one-half per centum upon the gross

transportation receipts, hereinafter specified, for the privilege of exercising its franchise in this State, except that every such railway corporation operating an electric railway or railways shall pay to the State an annual State franchise tax equal to one and six-tenths per centum upon the gross transportation receipts, hereinafter specified, for the privilege of exercising its franchise in this State; *which, with the taxes hereinbefore provided·for, shall be in lieu of all taxes or license charges whatsoever, upon the franchises of such corporations and the shares of stock issued by them, and upon all their property, as hereinbefore provided; * * *."*   (Italics supplied.)

Section 229 of the Tax Code (Acts 1926, ch. 576, p. 990; Acts 1928, ch. 45, p. 159), after providing for the taxation of the real and personal property of water, heat, light and power companies, reads in part as follows:

"Every corporation coming within the provisions of this and the preceding section shall pay to the State an annual State franchise tax equal to one and one-eighth per centum of its gross receipts, for the privilege of exercising its franchises in this State, *which with the taxes hereinbefore provided for, shall be in lieu of all State taxes or license charges whatsoever, upon the franchises of such corporation, and the shares of stock issued by it,* and upon all its property as hereinbefore provided; * * *." (Italics supplied.)

The question presented by the first assignment of error is whether the exemption from taxation, under sections 170 and 177 of the Constitution and sections 216 and 229 of the Tax Code, of "shares of stock issued by" railroad and electric power companies, which have paid franchise taxes in Virginia, exempts from taxation the income or dividends received by the shareholder from such stock.

The petitioner contends that a tax on such dividends is a tax on the shares themselves which is, prohibited by the above constitutional and statutory provisions.

The Commonwealth contends that its system of taxation, as embodied in the Constitution and statutes enacted

pursuant thereto, expressly recognizes the distinction between a direct tax on property itself and a tax on the income derived from such property, and treats property, and income therefrom, as separate subjects of taxation. It argues that the exemption provided for in the above sections of the Constitution and Tax Code is limited to an exemption from taxes directly imposed or levied on "shares of stock" themselves, as one subject of taxation, as distinguished from the dividends or income from such stock, as a separate subject of taxation.

In approaching the subject we should keep in mind the distinction between legislative *power* and legislative *policy.* Whether the General Assembly has the *power,* under the Constitution, to enact a particular tax law is a question for the courts. But whether it is a wise *policy* to do so is a question solely for the lawmaking body and is no concern of the courts.

Likewise we should bear in mind these well-fixed rules of construction:

(1) Taxation being the rule and exemption therefrom the exception, constitutional and statutory provisions exempting property from taxation should be strictly construed against the exemption and any doubt should be resolved in favor of the State. *Com.* v. *Lynchburg Y. M. C. A.,* 115 Va. 745, 747, 748, 80 S. E. 589, 50 L. R. A. (N.S.) 1197; *Board of Supervisors* v. *City of Norfolk,* 153 Va. 768, 775, 776, 151 S. E. 143; *Arcese* v. *Com.,* 160 Va. 116, 124, 168 S. E. 465; *Bank of Commerce* v. *Tennessee,* 161 U. S. 134, 146, 16 S. Ct. 456, 40 L. Ed. 645.

(2) Every reasonable doubt should be resolved in favor of the constitutionality of an act of the legislature. *Bourne* v. *Board of Supervisors,* 161 Va. 678, 685, 172 S. E. 245; *Carpel* v. *City of Richmond,* 162 Va. 833, 840, 175 S. E. 316.

Whether a tax on income from property is, generically speaking, a tax on the property from which the income is derived, is a question about which the authorities are in conflict. 26 R. C. L., p. 142, sec. 116. The petitioner's view finds support in *Pollock* v. *Farmers' Loan & Trust*

*Co.,* 157 U. S. 429, 15 S. Ct. 673, 39 L. Ed. 759; Id., 158 U. S. 601, 15 S. Ct. 912, 39 L. Ed. 1108, in which the Supreme Court of the United States, in 1895, by a divided court, held unconstitutional a Federal income tax law on the ground, among others, that by levying a tax on rents, derived from real estate and interest received from municipal bonds, the statute, in effect, levied a direct tax on such real estate and bonds, in contravention of article I, section 2, clause 3, of the Constitution of the United States, which requires that "direct taxes" shall be apportioned among the States according to population.

For other cases holding that a tax on income is a tax on property from which income is derived, see *Eliasberg Bros. Mercantile Co.* v. *Grimes,* 204 Ala. 492, 86 So. 56, 11 A. L. R. 300; *Bachrach* v. *Nelson,* 349 Ill. 579, 182 N. E. 909; *Tax Commissioner, Trefry* v. *Putnam,* 227 Mass. 522, 116 N. E. 904, L. R. A. 1917F, 806; *Culliton* v. *Chase,* 174 Wash. 363, 25 P. (2d) 81.

The claim that the *Pollock Case* is a complete and ultimate authority for holding that a tax on income derived from property is a tax on the property itself is considerably weakened by what Chief Justice White later said in *Brushaber* v. *Union Pacific Railroad Co.,* 240 U. S. 1, 16, 36 S. Ct. 236, 241, 60 L. Ed. 493, L. R. A. 1917D, 414, Ann. Cas. 1917B, 713, viz., "The conclusion reached in the *Pollock Case* did not in any degree involve holding that income taxes generically and necessarily came within the class of direct taxes on property, but on the contrary recognized the fact that taxation on income was in its nature an excise * * *."

It is interesting to note that in 1923, the same court, speaking through Mr. Justice Holmes, in *Clyde* v. *Gilchrist,* 262 U. S. 94, 43 S. Ct. 501, 67 L. Ed. 883, unanimously upheld a decision of the highest court of New York that the Mortgage Recording Tax Law of that State, which provided that the payment of taxes on the recordation of mortgages should exempt them and the obligations thereby secured from "all taxation," did not exempt from taxation the income from such mortgages.

In any event, we think it may be safely said that the great weight of authority is contrary to the view that a tax on income derived from property is a tax on that property itself. An income tax is now generally accepted to be an excise tax.

In Black on Income and Other Federal Taxes (4th Ed.) sec. 2, the author says: "A tax on incomes is not a tax on property, and a tax on property does not embrace income * * *. For the same reason, a tax laid on income is different from a tax laid on the property out of which the income arises."

In *Miles* v. *Department of the Treasury,* 207 Ind. ..., 193 N. E. 855, 97 A. L. R. 1474, the highest court of Indiana, in a unanimous decision handed down on January 29, 1935, after reviewing all of the authorities on the subject, including the *Pollock Case,* decided that a tax on income is not a tax on the property from which the income is derived, but is an excise tax. Speaking of the nature of an income tax, the court said (193 N. E. 855, 861, 97 A. L. R., p. 1483) : "We conclude that the tax in question is an excise, levied upon those domiciled in the State, upon the basis of the privilege of domicile, and that the burden may reasonably be measured by the amount of income. We feel that the weight of reason and authority sustains this view."

In *In re Opinion of the Justices,* 133 Me. 525, 178 Atl. 621, 623, decided on March 16, 1935, the highest court of Maine, in a unanimous decision, reached the same conclusion.

See also, *Sims* v. *Ahrens,* 167 Ark. 557, 271 S. W. 720, 730, 735; *Featherstone* v. *Norman,* 170 Ga. 370, 153 S. E. 58, 65, 70 A. L. R. 449, 459; *Diefendorf* v. *Gallet,* 51 Idaho 619, 10 P. (2d) 307, 313; *Reed* v. *Bjornson,* 191 Minn. 254, 253 N. W. 102, 109; *Hattiesburg Grocery Co.* v. *Robertson,* 126 Miss. 34, 88 So. 4, 25 A. L. R. 748; *Ludlow-Saylor Wire Co.* v. *Wollbrinck,* 275 Mo. 339, 205 S. W. 196, 198; *O'Connell* v. *State Board,* 95 Mont. 91, 25 P. (2d) 114; *Opinion of the Justices,* 77 N. H. 611, 93 Atl. 311, 313; *Maxwell* v. *Kent-Coffey Mfg. Co.,* 204 N. C. 365, 168 S. E. 397, 400, 90

A. L. R. 476, affirmed 291 U. S. 642, 54 S. Ct. 437, 78 L. Ed. 1040; *State* v. *Frear,* 148 Wis. 456, 134 N. W. 673, 689, 135 N. W. 164, L. R. A. 1915B, 569, 606, Ann. Cas. 1913A, 1147.

■ But aside from a theoretical discussion of the nature of an income tax, we think an examination of the Virginia Constitution, in the light of its historical background, shows that its builders intended that income derived from property and property itself be treated as separate and distinct subjects of taxation, and that the exemption of "shares of stock," as one subject of taxation does not exempt the other subject, namely, dividends or income derived from such stock.

Article IV of the Constitution of 1850 distinguished between property and income as separate subjects of taxation. Section 22 provided that "all property other than slaves shall be taxed in proportion to its value." Section 25 provided for "a tax on incomes, salaries and licenses" with the added proviso that "no tax shall be levied on property from which any income so taxed is derived." This section also prohibited a tax on "capital invested" in any trade or business on which there was a license tax.

The corresponding article X of the Constitution of 1870 likewise provided (section 1) for taxes on "all property * * * in proportion to its value," license taxes, and a tax on incomes in excess of $600 per year. Section 4 of this article expressly provided that "assessments upon all stock shall be according to the market value thereof."

When the convention of 1902 assembled, having before it the Constitution of 1850 and 1870, it provided in section 168 for the taxation of "all property" at "uniform" rates.

Section 170 provided for the taxation of incomes and for the levying of license and franchise taxes. Each of these was treated as a separate subject of taxation.

■ It will be well to observe here that instead of providing for an *ad valorem* "assessment upon *all stock,*" as is found in article X, section 4, of the Constitution of 1870, section 170 of the Constitution of 1902 provided for the *exemption from taxation* of "shares of stock issued by"

any corporation doing business in this State on which there has been imposed a franchise tax, or whenever all of its capital has been taxed. It is logical to assume that the exemption provided for in section 170 is the *ad valorem* tax on stock which is dealt with in the corresponding article X, section 4, of the Constitution of 1870.

Note should be taken of the fact that neither the Constitution of 1870 nor that of 1902 contains the provision of article IV, section 25, of the Constitution of 1850 which prohibited a tax "on property from which any income so taxed is derived." This omission is significant in view of the claim of the petitioner.

Section 176 of the Constitution, as originally adopted, after providing for the levying of property taxes on the real and personal property of railroads (with certain exceptions), concluded with the proviso that "no tax shall be laid upon the net income of such corporations."

If the framers of this section had considered that a tax upon the net income of a railroad was a tax upon its property within the meaning of the prohibition against "all other taxes" upon that property and "the shares of stock issued by it," contained in section 177, why was it necessary to insert the proviso against an income tax? Is it not logical to infer that the draftsman of the section did not consider that a tax on income was one of the "other taxes" which was otherwise prohibited?

By an amendment, ratified in 1928, the proviso was eliminated from section 176. This was done on the recommendation of the Prentis commission which gave the following reason for the change: "The last proviso in the original section is eliminated as unwise and an improper restriction on the taxing power of the State."

It should be noted that the commission did not say it had concluded that the prohibition against "all other taxes" on the shares of stock" in section 177 made this proviso unnecessary. It gave an entirely different reason for its elimination.

Whether the elimination of the proviso gave the Gen-

eral Assembly the power to impose a tax on the net income of railway and canal companies (as argued by the Attorney-General) is a question which is not before us and on which we express no opinion.

It seems clear that since the adoption of the Constitution of 1902 the General Assembly has treated the tax on income and the tax on property from which it is derived as separate subjects of taxation.

Immediately after the Constitution of 1902 took effect, the General Assembly met in extra session to adjust the statute law to the changes in the organic law. The enacting clause of the tax bill (Acts of 1902-3-4, Ex. Sess., ch. 148, p. 155) provided for the levying of taxes "on persons, property, and incomes" as separate subjects of taxation. The bill specifically provided for an *ad valorem* tax on "shares of stock," as a subject of taxation, excepting, however, the "stock of companies all of whose capital is taxed by the State of Virginia, or which pay a franchise tax" to this State. Section 8, subd. 8.

It likewise provided for the taxation of income and defined it as "all other gains and profits from any source whatsoever." Section 10, subd. 5 [now Tax Code, section 24]. Certainly this language is broad enough to embrace dividends. No exemption was provided for the income on the shares mentioned in section 170.

So we see that at once the legislature applied and restricted the exemption in sections 170 and 177 to a property tax on shares of stock.

We shall not stop here to review in detail the several acts passed in the intervening years from 1904 to 1928. Suffice it to say that an examination of each will show the same distinction between property and income as separate subjects of taxation.

Beginning as early as 1915 (Acts 1915, Ex. Sess., ch. 81, p. 113), "income" is specifically defined as including "all dividends." The *ad valorem* property tax on shares of stock was continued until 1928 when it was dropped as a matter of legislative policy.

In 1915 (Acts 1915, Ex. Sess., ch. 70, p. 100) shares of stock in corporations which had paid this State a franchise tax were exempted from the property tax.

Beginning in 1918 (Acts 1918, ch. 219, p. 395), and continuing to the present time (Tax Code, sec. 25, sub-sec. l), the taxpayer was allowed, in arriving at his net income, to deduct dividends from stocks in corporations which had been assessed with income taxes by this State.

Thus we think it clearly appears that from the time the Constitution of 1902 became effective down to the present time the General Assembly considered that it had the power to tax "all dividends," including those from public service corporations, and that the exemption from taxation of the "shares of stock" in sections 170 and 177 of the Constitution refers to an exemption from property taxes and not to an exemption from taxation on the income or dividends received from such shares.

It is stated in the brief of the Attorney-General, and not denied by the petitioner, that from 1919 to the present time the State tax officials have been assessing and collecting income taxes on dividends derived from public service corporations. This practical construction given to the laws by public officials is entitled to, and has, great weight with us. *City of Norfolk* v. *Bell,* 149 Va. 772, 780, 781, 141 S. E. 844; *South East Public Service Corp.* v. *Com.,* 165 Va. 116, 181 S. E. 448, 452.

The General Assembly of 1926 (Acts 1926, ch. 481, p. 797) provided for the creation of a commission to "study the Constitution of Virginia and propose in detail such revision of the same as it may be of opinion will be for the best interests of the Commonwealth * * *." This commission, headed by Hon. Robert R. Prentis, then president of this court, must have been familiar with the statutory construction of the Constitution which we have reviewed and the established administrative practice whereby dividends on stocks of public service corporations paying franchise taxes in Virginia were subject to an income tax. If the commission had thought that there

was any conflict between the existing practice and the existing law, surely it would have recommended that such be cured by an appropriate amendment or amendments to the Constitution. And yet it made no such recommendation.

■ Furthermore, we think that a reading of the Virginia income tax law itself shows that it is not a tax upon property from which the income is derived, but is an excise tax. Section 38 of the Tax Code (Acts 1926, ch. 576, p. 960, sec. 9, subsec. 2; Acts 1928, ch. 45, p. 50) provides that "a tax is hereby annually levied for each taxable year upon every resident individual of this State, upon and with respect to his entire net income as herein defined."

The tax is not levied on property but on the *"individual * * * upon and with respect to his entire net income * * *."* It is levied on the taxpayer in proportion to his net income, not in proportion to his property.

Again, the tax is levied with respect to his income derived from all sources. Whether he pays any tax, and the amount thereof, depends both on the amount of his gross income from all sources and on the exemptions and deductions which fit his particular case.

In *Atlantic, etc., Ry. Co.* v. *Southern Ry. Co.,* 149 Va. 701, 706, 141 S. E. 770, 772, Mr. Justice Holt, speaking for this court, said: "The tax so levied 'is not similar to other forms of taxation, since it is not imposed upon property or business but upon the proceeds arising therefrom. Black on Income and Other Federal Taxes, sec. 1. An income tax is an assessment upon the income of the person and not upon any particular property from which that income is derived.' " This language is quoted with approval by Chief Justice Campbell in the recent case of *Com.* v. *Hannaford,* 159 Va. 84, 88, 165 S. E. 512.

■ When a dividend is paid it becomes separated from the stock and becomes a subject of taxation, different from the property from which it was derived, just as growing timber, when cut, loses its nature as real estate and becomes personal property.

No one doubts that when dividends have been received by a stockholder and deposited by him in bank, they become money in the hands of the taxpayer and subject to be taxed as such.

We think the fundamental weakness in petitioner's case is his theory that any tax which affects property in any way, directly or indirectly, is a tax on that property. This argument is not sound and has been expressly repudiated by this court.

In *Com.* v. *Carter,* 126 Va. 469, 102 S. E. 58, and in *Cornett's Ex'rs* v. *Com.,* 127 Va. 640, 105 S. E. 230, we held that an inheritance tax is not a tax upon the property transferred from the estate of the decedent to the beneficiary, but a privilege tax. And yet it certainly affects the property transferred.

In *Com.* v. *Bibee Grocery Co.,* 153 Va. 935, 151 S. E. 293, we held that a license tax was not a tax on property. How could it be claimed that it does not affect the property which is used in the business?

In *Com.* v. *Werth,* 116 Va. 604, 609, 82 S. E. 695, Ann. Cas. 1916D, 1263, we held that a license tax, though graduated according to the amount of income, was not an income tax, i. e., a tax on the income affected.

The owner of an automobile in Virginia pays a tax for the privilege of operating his car. In a sense this tax affects the car, but it is universally conceded that this is a license or privilege tax and not a tax on the property concerned, to-wit, the automobile.

And so we think, in the final analysis, that the income tax here under review is an excise tax and not a tax on the property from which it is derived. *Atlantic, etc., Ry. Co.* v. *Southern Ry. Co.,* 149 Va. 701, 706, 141 S. E. 770; *Com.* v. *Hannaford,* 159 Va. 84, 88, 165 S. E. 512; Black on Income and Other Federal Taxes (4th Ed.), sec. 2; 26 R. C. L., p. 142, sec. 116.

Section 168 of the Constitution provides that "all taxes * * * shall be uniform * * *." In *Bradley & Co.* v. *Richmond,* 110 Va. 521, 525, 66 S. E. 872, 874, we said: "The

provisions in the Constitution requiring equality and uniformity of taxation apply only to a direct tax on property, and not to license taxes, which do not admit of a tax strictly equal and uniform in the sense contended for. *Helfrick's Case,* 29 Gratt. [70 Va.] 844. When sections 168 and 170 of the Constitution are read together, it is clear that it was not intended to include a license upon a business in any of the provisions speaking of taxes on property."

This principle was reaffirmed by us in *Com.* v. *Bibee Grocery Co.,* 153 Va. 935, 938, 151 S. E. 293, in which Chief Justice Campbell spoke for the court.

If, construing sections 168 and 170 together, we said that "all taxes" meant "all *direct* taxes *on property*" to the exclusion of license taxes, then it is equally true that "all other taxes" in section 177 can likewise be construed to mean "all other *direct* taxes *on property*" to the exclusion of income taxes.

██ Our conclusion is that shares of stock and income therefrom are two separate and distinct subjects of taxation within the meaning of the Constitution (*State* v.*Frear,* 148 Wis. 456, 134 N. W. 673, 689, 135 N. W. 164, L. R. A. 1915B, 569, 606, Ann. Cas. 1913A, 1147; Cooley on Taxation (4th Ed.) p. 3479), and that the exemption from taxation of the "shares of stock" mentioned in sections 170 and 177 of the Constitution and in sections 216 and 229 of the Tax Code, here under review, does not exempt from taxation the income derived from such "shares of stock."

The plaintiff in error next contends that the assessment on December 29, 1931, with respect to the 1927 income, and the assessment on July 19, 1932, with respect to the 1928 income came too late.

The determination of the correctness of this contention depends upon the meaning of section 418 of the Tax Code, which provides, in part, as follows:

"If any person, * * * shall have hitherto failed or shall hereafter fail for any *tax year of the three tax years last past,* to make a proper return of his, * * * income, or to

have the same assessed for taxation, or to pay the proper taxes thereon within the time required by law, * * * the department of taxation, * * * shall ascertain the amount of such * * * income * * * which should have been assessed, and shall assess the taxes prescribed by law thereon for the year or years so omitted, * * *." (Italics supplied.)

The plaintiff in error argues that the assessment made on December 29, 1931, with respect to the income received during the calendar year 1927, was an assessment for the "tax year" 1927, was after "the three tax years last past," to-wit: 1930, 1929 and 1928, and came too late.

The same argument is made with reference to the assessment on July 19, 1932, with respect to the income received during the calendar year 1928. This assessment, he says, was for the "tax year" 1928, was after "the three tax years last past," to-wit: 1931, 1930, and 1929, and likewise came too late.

The Commonwealth contends that the "tax year" means the year in which the assessment is made, as distinguished from the "taxable year," which means the year in which the income is received; that while the tax assessed in 1928 is "with respect to," i. e., based upon, the 1927 income, it is levied not for the tax year 1927, but for the tax year 1928; that "the three tax years last past" were 1931, 1930, and 1929, and that, therefore, the assessment in December, 1931, was within the limit prescribed. The same argument is made with reference to the July, 1932, assessment with respect to the 1928 income.  .

We think the position of the Commonwealth is well taken. As we pointed out in considering the first assignment of error, the income tax is an excise tax levied "upon every resident individual of this State, upon and with respect to his entire net income * * *." (Tax Code, section 38.) The tax assessed in 1928, while measured by, i. e., "with respect to," the 1927 income, is, nevertheless, a tax for year 1928 and not for year 1927. "Incomes are taxed, not in the year such income is received, but in the

succeeding year." *Anderson Bros.* v. *Com.,* 138 Va. 18, 20, 120 S. E. 860; 61 C. J., p. 1581.

Furthermore, the Tax Code itself, we think, recognizes the distinction between "tax year" and "taxable year" contended for by the Commonwealth.

Section 424 is as follows:

*"Tax Year.* Except where otherwise specifically provided, the tax year shall begin on the first day of January of each year and shall end on the thirty-first day of December of each year and all assessments shall be made as of the first day of January of each year."

Here clearly "tax year" refers to the year in which the assessments are made.

Section 23 of the Tax Code defines "taxable year" as "the calendar year or the fiscal year ending during such calendar year upon the basis of which the net income is computed under this chapter."

It is plain that the words "taxable year" as here used, mean the year during which the income is received, that is the general accounting period (*Bankers' Trust Co.* v. *Bowers* [C. C. A. 2], 295 Fed. 89, 92, 31 A. L. R. 922), as distinguished from the "tax year" when the assessment is made.

We, therefore, conclude and hold that the expression "tax year," as used in section 418 of the Tax Code, means the year in which the assessment is made "with respect to," that is, based upon, the income received during the preceding year; that since the income received in the "taxable year" 1927 was first assessable in the "tax year" 1928, the assessment made on December 29, 1931, for income omitted from the 1928 assessment, was within "the three tax years last past;" and that the same is true of the July, 1932, assessment with respect to the 1928 income.

On the whole our conclusion is that the judgment of the lower court is right and should be affirmed.

*Affirmed.*

CAMPBELL, C. J., and HUDGINS, J., dissenting.

The late lamented Mr. Justice Epes, just prior to his death, made an exhaustive study of the questions raised in this record, and reached a conclusion diametrically opposite to that expressed in the majority opinion, and as we concur in the conclusion reached by Mr. Justice Epes, we are filing his opinion as our reasons for our dissent:*

On August 11, 1932, Eppa Hunton, IV, as executor of Eppa Hunton, Jr., filed his petition, asking that three assessments made by the State Department of Taxation against Eppa Hunton, Jr., during his lifetime, for State income taxes upon income alleged to have been omitted by him from his income tax reports filed in 1928, 1929, and 1930, be adjudged wholly illegal and the assessments corrected by annulling them.[1]

The items of income involved were dividends received by Eppa Hunton, Jr., upon shares of stock issued by the following railroad and electric power companies during the calendar years indicated:

| Company | Dividends Received During | | |
| | 1927 | 1928 | 1929 |
| --- | --- | --- | --- |
| R., F. & P. Railroad Co. .......$ | 336 | $ 1,128 | $ 1,752.00 |
| Chesapeake & Ohio Ry. Co.... | 6,300 | 7,000 | 7,437.50 |
| Atlantic Coast Line Ry. Co.... | 2,600 | 3,000 | 3,000.00 |
| Norfolk & Western Ry. Co.... | 2,000 | 2,000 | 2,400.00 |
| Southern Ry. Co............. | 525 | 800 | 850.00 |
| Virginia Electric & Power Co.. | 7,150 | 7,600 | 7,600.00 |
| Appalachian Elec.& Power Co. | 175 | 1,225 | 1,487.50 |
| | $19,086 | $22,753 | $24,527.00 |

It is admitted that for each of the four years 1926-1929 each of these companies was assessed with and paid the

*The opinion written by Epes, J., was originally adopted as the opinion of the court, and was concurred in by Campbell, C. J., and Hudgins, Browning and Chinn, JJ.—Reporter.

[1] This case involves the interpretation and construction of language used in the Constitution of Virginia of 1902. It is of interest to note that Eppa Hunton, Jr., was a member of the convention that framed and proclaimed that Constitution.

annual State franchise tax and other taxes required of it by section 177 of the Constitution of Virginia, by section 28, ch. 111, Acts 1927, Ex. Sess., pp. 213, 217, and its successor, section 216 of the Tax Code of Virginia[2] (which relate to the taxation of railroad and canal companies) and by section 36½, ch. 576, Acts 1926, p. 990, and its successor, section 229 of the Tax Code of Virginia, Acts 1928, ch. 45, p. 159 (which relate to the taxation of water, heat, light and power companies.)[3]

No State income tax (as distinguished from the franchise tax measured by gross receipts) was imposed upon the "net" income of any of these companies for any of those years.

Mr. Hunton took the view that the dividends paid by these railroad and power companies were exempted from the State income tax imposed upon the "net income" of individuals, as defined in subsections 1-12 of section 9, ch. 576, Acts 1926, pp. 959-964, and in sections 23-30 of the Tax Code of 1928 (Acts 1928, ch. 45, pp. 43-47). Acting in accordance with this view, either he did not include these dividends in the gross income reported by him in his tax

---

[2] Wherever the expression "Tax Code" is used, chapter 45, Acts 1928, is meant.

[3] The record does not expressly so state, but the printed reports of the State Corporation Commission show the following facts: Four of the railroad companies named are "steam railroads." During the period 1927-1930 the Virginia Electric & Power Company was doing both the business of an electric company (i. e., transporting passengers and perhaps to some extent freight), and the business of furnishing light and power. The Appalachian Electric & Power Company was doing only the latter business. In each of these years the Virginia Electric & Power Company was assessed with two annual State franchise taxes, (1) as an electric railway company with a franchise tax amounting to the required percentage of its gross transportation receipts, and (2) as an electric light and power corporation a franchise tax amounting to the required percentage of its "gross, earnings and receipts" in Virginia, not including its transportation receipts. For instance, the annual State franchise taxes assessed against it in 1929 were: (1) on its gross transportation receipts for the year December 31, 1928, (amounting to $4,290,144) a tax of one and six-tenths per cent, amounting to $68,642.31; (2) on "gross earnings and receipts in Virginia" (other than transportation receipts) for the year ending December 31, 1928, (amounting to $7,977,348) a franchise tax of one and one-eighth per cent, amounting to $89,745.17.

reports filed in 1928, 1929, and 1930, or, if he did, he deducted the amount of them in ascertaining and stating his net taxable income as defined by the income tax statute.

In 1932 the Department of Taxation, seemingly having come to the belated conclusion that the dividends paid on shares of stock issued by these companies were not exempt from the imposition of a State income tax, on the following dates assessed Mr. Hunton with income taxes thereon as omitted income:

In December, 1931, it assessed him with income tax amounting to $572.58 on the dividends received in 1927. On July 19, 1932, it assessed him with income taxes amounting to $682.59 on the dividends received in 1928, and $735.81 on the dividends received in 1929.

The case presented no issues of fact, and the questions of law raised in the trial court were the same as those here presented by the assignments of error made. The court decided these questions of law against the petitioner, and entered an order dismissing his petition.

In his petition for a writ of error the petitioner alleges that the court erred in refusing the relief prayed for the following reason:[4]

Sections 170 and 177 of the Constitution of Virginia, operating in conjunction with section 28 of the tax bill approved April 16, 1903, (section 28, ch. 148, Acts 1902-03-04, p. 169), as amended by ch. 111, Acts 1927, Ex. Sess., p. 217, and its successor, section 216 of the Tax Code of Virginia of 1928 (which relate to the taxation of railroad companies), and in conjunction with section 36½, ch. 576, Acts 1926, p. 990, and its successor, section 229 of the Tax Code (which relate to taxation of light and power companies), prohibit the imposition of an income tax upon dividends

---

[4] He also alleges that, even if it be granted that the dividends paid by such companies are subject to have a State income tax imposed thereon, at the times the assessments were made on the dividends received in 1927 and 1928, the Department of Taxation was without authority to make them, because they were not made within the time mentioned in section 418 of the Tax Code. But in the view which we take of this case it is not necessary to consider this assignment of error.

received by the owner thereof from shares of stock issued by a railroad corporation or a light and power corporation, which pays an annual State franchise tax, because such a tax is in fact a tax upon the shares of stock.

The provisions of section 170 and section 177 of the Constitution are given below in the text, with the language upon which the petitioner relies printed in small capitals; and in the footnote[5] we quote sections 168, 169, 171, 176,

---

[5] Other pertinent sections of the Constitution of Virginia:

Section 168. "All property, except as hereinafter provided, shall be taxed; all taxes, whether State, local, or municipal, shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general law. *The General Assembly may define and classify taxable subjects, and, except as to classes of property herein expressly segregated for either State or local taxation, the General Assembly may segregate the several classes of property so as to specify and determine upon what subjects State taxes, and upon what subjects* local taxes may be levied."

Note: This section does not require, as did the Constitutions of 1850 (section 22, art. 4) and 1870 (section 1, art. 10) that "taxation shall be equal and uniform;" or that, except as otherwise provided in the Constitution, "all property" which is susceptible of being so taxed shall be taxed "in proportion to its value."

The omission of the words "equal and" made a very far reaching change, and provoked more debate in the convention of 1902 than any other change made by it in the sections relating to taxation.

Section 169. "Except as hereafter provided, all assessments of real estate and tangible personal property shall be at their fair market value, to be ascertained as prescribed by law. * * * (Nothing in this Constitution shall prevent the General Assembly, after the first day of January, 1913, from segregating for the purpose of taxation, the several kinds or classes of property, so as to specify and determine upon what subjects, State taxes, and upon what subjects, local taxes may be levied.")

The provisions of the first sentence of this section are confined to "real estate and tangible personal property," which was not true of the corresponding sections of the Constitutions of 1850 (section 22, art. 4) and of 1870 (section 1, art. 10). This change has the effect of restoring to the General Assembly the power (which it had and exercised prior to the Constitution of 1850) to tax bonds, notes, shares of stock, etc., solely through the medium of a tax upon the income derived therefrom.

Section 171 as it read in the Constitution of 1902 merely provided the method of assessing the value of real estate. It was omitted by the amendments of 1928, and the below section inserted as section 171:

Section 171. "No State property tax for State purposes, shall be levied on real estate or tangible personal property, except the rolling stock of public service corporations. Real estate and tangible personal property, except the rolling stock of public service corporations, are hereby segregated for, and made subject to, local taxation, only, and shall be assessed or reassessed for local taxation in such manner and

178, and 181 and parts of section 183 of the Constitution which have pertinent bearings on the meaning of the language used in section 170 and section 177. In quoting the sections of the Constitution in the text and in the footnote, except where otherwise stated, we have pursued the course of placing in brackets the words contained in the sections as ordained in 1902, which were omitted by the amendments of 1928 (see Acts 1928, ch. 205), and in italics words

at such times as the General Assembly has heretofore prescribed, or may hereafter prescribe, by general laws."

Note: We construe this section to relate to the segregation of real estate and tangible personal property for the purpose of the imposition of a "property tax" thereon, as such a tax is distinguished from a "license tax" or an "income tax." The first sentence dominates and restricts the meaning of the second sentence.

Section 176. "The State Corporation Commission shall annually ascertain and assess, [at the time hereinafter mentioned, and] in the manner [required by the Board of Public Works, by the law in force on January the first, 1902,] *prescribed* by law, the value of the roadbed, and other real estate, rolling stock, and all other personal property whatsoever (except its franchise and the nontaxable shares of stock issued by other corporations) in this State, of each railway corporation, whatever its motive power, now or hereafter liable for taxation upon such property; * * * and *subject to such segregation of property, if any, as is provided in section 171 of this Constitution*, such property shall be taxed for State, county, city, town and district purposes in the [same] manner [as authorized by said law] *prescribed by law*, at such rates of taxation as may be imposed by them, respectively, from time to time, upon the real estate and personal property of natural persons [provided, that no tax shall be laid upon the net income of such corporations.]"

Note: The statute in effect on January 1, 1902, relating to the taxation of railroad companies, was sections 19 and 20, ch. 244, Acts 1889-90, pp. 207, 208, as amended by the amendment of section 19 by Acts 1891-92, ch. 254, pp. 428, 429, and Acts 1897-98, ch. 76, p. 78. These sections provided that the value of the real estate, roadbed, rolling stock and other tangible personal property, and the "stocks, bonds, and other evidences of debt" and "all other personal property" of such corporations should be assessed, according to nine classifications therein specified, by the Board of Public Works, and imposed a "property tax" thereon at the same rate as the property tax imposed upon the property of natural persons. They also imposed upon every such company "an income tax of one per centum per annum, which shall be ascertained by deducting the cost of operations, repairs, and interest on indebtedness from gross receipts."

The convention desired to incorporate the provisions of this statute for the assessment of the property of railroad companies into section 176 by reference to the existing laws instead of copying its provisions at length. But it recognized that an income tax upon either the gross or net income derived from the use of property is a tax upon that property; and, as it intended to omit the net income tax imposed by

not in the original sections, which were inserted by the amendment of 1928. For the text of the sections as originally ordained read the sections with the words in brackets and without the words in italics, and vice versa for the text of the sections after the amendments of 1928.

Section 170. "The General Assembly may levy a tax on incomes in excess of six hundred dollars per annum; may

the existing statute it felt it necessary to add the proviso, "provided that no tax shall be laid upon the net income of such corporations," to prevent the "net" income provision of the existing law from being applicable.

The commission which suggested the amendments of 1928, having omitted all reference to the law in force on January 1, 1902, omitted this proviso, saying in its report: "The last proviso in the original section [176] is eliminated as unwise and an improper restriction on the taxing power of the State."

It has been suggested that the omission of this proviso is indicative that the view of the commission was that an income tax imposed upon "net" income, including income derived from the use of property, is not a tax upon that property. But when the changes made in section 176 and other sections relating to the taxation of railroads are borne in mind, other forcible reasons for the omission of the proviso are apparent which make applicable the comment of the commission. This robs the suggestion of much of any force it may have and of any determinative force on this point.

Section 178. "The amount of such franchise tax shall be equal to [one] *such* per centum of the gross transportation receipts of such corporation [s for] *of* the year [ending June the thirtieth of each year] *preceding the year for which the tax is levied, or the year for which the tax is levied, as may be prescribed by law,* to be ascertained by the State Corporation Commission in the following manner:

"(a) When the road or canal of the corporation lies wholly within this State, the tax shall be equal to [one] *the prescribed* per centum of the entire gross transportation receipts of such corporation.

"(b) When the road or canal of the corporation lies partly within and partly without this State, or is operated as a part of a line or system extending beyond this State, the tax shall be equal to (one) *the prescribed* per centum of the gross transportation receipts earned within this State, to be determined as follows: * * *."

Note: One of the primary grounds upon which rests the validity of the franchise tax imposed by this section is the recognition of it as a tax not only for the privilege of doing business, but as property tax upon the value of the company's franchise and in lieu of it and of all taxes (other than those specified) upon its property and the shares of stock issued by it. See *Philadelphia, etc., Steamship Co.* v. *Pennsylvania,* 122 U. S. 326, 7 S. Ct. 1118, 30 L. Ed. 1200. A tax which must find its justification in whole or in part in the fact that it is in lieu of some other tax or all other taxes upon property, is *pro tanto* a tax upon that property.

Section 181. "[After January the first, 1903, the system of taxation, as to the corporations mentioned in sections 176 and 177, shall be as set forth in sections 176 to 180, inclusive * *. * and such system shall

levy a license tax upon any business which cannot be reached by the *ad valorem* system; and may impose State franchise taxes, and in imposing a franchise tax, may, in its discretion, make the same in lieu of taxes upon other property, in whole or in part, of a transportation, industrial, or commercial corporation. WHENEVER A FRANCHISE TAX SHALL BE IMPOSED UPON A CORPORA-

---

so remain until the first day of January, 1913, and thereafter until modified or changed, as may be prescribed by law; provided, that,] *Notwithstanding the provisions of sections 171 and 176 to 180, inclusive, the General Assembly shall have power to change the system of taxation as to the corporations therein mentioned to be administered by the State Corporation Commission, or other central State agency.* If the said system of *taxation* shall, for any reason become inoperative [,] the General Assembly shall have power to [adopt] *prescribe* some other system *in lieu thereof, and to provide how and by what agencies it shall be administered.*"

There were a number of changes in language made in section 183 by the amendments of 1928. But, as none of them made any change here pertinent in the meaning of the section, in quoting only the first paragraph do we show in brackets the words omitted by the amendment of 1928 and in italics the words inserted by these amendments. In quoting other parts of it we give only the text of the section as amended.

Section 183. *"Property exempt from taxation.*—[Except as] Unless otherwise provided in this Constitution, the following property and no other [,] shall be exempt from taxation, State and local, *including inheritance taxes* [; but the General Assembly may hereafter tax any of the property hereby exempted save that mentioned in subsection (a)]:

"(a) Property owned directly or indirectly by the United States, the Commonwealth or any political subdivision thereof, and obligations of the Commonwealth issued since February 14, 1882, or hereafter exempted by law."

"(c) Private or public burying grounds or cemeteries and endowment funds, lawfully held, for their care, provided the same are not operated for profit.

"(d) Property owned by public libraries, incorporated colleges or other incorporated institutions of learning, not conducted for profit, together with the endowment funds thereof not invested in real estate. * * *"

"Except as to class (a) above, general laws may be enacted restricting but not extending the above exemptions."

As ordained in 1902 the section carried a separate paragraph reading:

"No inheritance tax shall be charged, directly or indirectly, against any legacy or devise made according to law for the benefit of any institution or other body or any natural or corporate person whose property is exempt from taxation as hereinbefore mentioned in this section."

By the amendments of 1928 this paragraph was omitted and the words "including inheritance taxes" inserted in the first paragraph.

TION DOING BUSINESS IN THIS STATE, OR WHEN-
EVER ALL THE CAPITAL, HOWEVER INVESTED, OF
A CORPORATION CHARTERED UNDER THE LAWS
OF THIS STATE, SHALL BE TAXED, THE SHARES OF
STOCK ISSUED BY ANY SUCH CORPORATION, SHALL
NOT BE FURTHER TAXED. * * *"

Section 177. "[Each] *every* such railway or canal cor-
poration [, including also any such as is exempt from tax-
ation as to its works, visible property, or profits,] shall
also pay an annual State franchise tax [equal to one per
centum] *to be prescribed by law,* upon the gross receipts
hereinafter specified in section 178, for the privilege of
exercising its franchises in this State, WHICH, WITH
THE TAXES PROVIDED FOR IN SECTION 176, SHALL
BE IN LIEU OF ALL OTHER TAXES, OR LICENSE
CHARGES WHATSOEVER UPON THE FRANCHISE OF
SUCH CORPORATION, THE SHARES OF STOCK IS-
SUED BY IT, (and) *OR* UPON ITS PROPERTY AS-
SESSED UNDER section 176; provided, that nothing
herein contained shall exempt such corporation from the
annual fee required by section 157[6] of this Constitution,
or from assessments for street and other public (local)
improvements authorized by section 170; and, provided,
further, that nothing herein contained shall annul or in-
terfere with or prevent any contract or agreement by ordi-

---

[6] Section 157. "Provision shall be made by general laws for the
payment [of a charter or registration fee] * * *; and also for the
payment by every domestic corporation, and foreign corporation doing
business in this State of an annual registration fee of not less than
five dollars, nor more than twenty-five dollars, which shall be irre-
spective of any specific license or other tax imposed by law upon such
company for the privilege of carrying on its business in this State,
or upon its franchise or property; * * *."

As originally adopted by the convention of 1902, section 177 did not
contain the words "the annual fee required by section 157, or from."
They were inserted by the committee on final revision and adjust-
ments.

Notwithstanding the express provision already made in section 157,
the committee on final revision and adjustments appeared to have
deemed it necessary to insert these words to precent the capitalized
provision in section 177 from overriding that of section 157. This is
indicative of the breadth of meaning which the framers of the Con-
stitution understood the words "other taxes" as used in the capitalized
portion of section 177 to have.

nance between street railway corporations and municipalities, as to compensation for the use of the streets or alleys of such municipalities by such railway corporations."

So far as they are here material, the provisions of both section 216 and section 229 of the Tax Code (Acts 1928, ch. 45) are the same as those of the corresponding statutes in force for a number of years prior thereto. We, therefore, quote only the pertinent parts of the sections of the Tax Code:

Section 216, after having provided for the taxation of the real and personal property (tangible and intangible) of railways and canal corporations, reads:

"Every such railway or canal corporation shall pay to the State an annual State franchise tax for each calendar year equal to one and one-half per centum upon the gross transportation receipts, hereinafter specified, for the privilege of exercising its franchise in this State, except that every such railway corporation operating an electric railway or railways shall pay to the State an annual State franchise tax equal to one and six-tenths per centum upon the gross transportation receipts, hereinafter specified, for the privilege of exercising its franchise in this State: WHICH, WITH THE TAXES HEREINBEFORE PROVIDED FOR, SHALL BE IN LIEU OF ALL TAXES OR LICENSE CHARGES WHATSOEVER, UPON THE FRANCHISES OF SUCH CORPORATIONS AND THE SHARES OF STOCK ISSUED BY THEM, AND UPON ALL THEIR PROPERTY, AS HEREINBEFORE PROVIDED; provided, that nothing herein contained shall exempt such corporation from the annual fee required by section 157 of the Constitution or from assessment for street and other local improvements, which shall be authorized by law, or from the county, city, town, district or road levies, hereinafter provided for other than a franchise tax; and, provided further, that nothing herein contained shall annul or interfere with, or prevent any contract or agreement by ordinance between street railway corporations

and municipalities as to compensation for the use of the streets or alleys of such municipalities by such railway corporation; * * *.

\* \* \* \* \* \* \* \* \* \*

"No State tax, county, city, town, district or road levy shall be laid on the net income of any railway or canal corporation, nor shall any county, city, town, district or road levy be laid on the gross transportation receipts of any such company."

Section 229 of the Tax Code, after providing for the taxation of the property, real and personal, of water, heat, light and power companies, reads in part as follows:[7]

"Every corporation coming within the provisions of this. and the preceding section shall pay to the State an annual State franchise tax equal to one and one-eighth per centum of its gross receipts, for the privilege of exercising its franchises in this State, WHICH, WITH THE TAXES HEREINBEFORE PROVIDED FOR, SHALL BE IN LIEU OF ALL STATE TAXES OR LICENSE CHARGES WHATSOEVER, UPON THE FRANCHISES OF SUCH CORPORATION, AND THE SHARES OF STOCK ISSUED BY IT, AND UPON ALL ITS PROPERTY AS HEREINBEFORE PROVIDED; provided, that nothing herein contained shall exempt such corporation from the annual fee required by section 157 of the Constitution, or from assessments for street and other local improvements, which shall be authorized by law, nor from the county, city, town, district, or road levies; provided that any city

---

[7] Section 228 of the Tax Code, Acts 1928, ch. 45, pp. 157, 159 (and of the corresponding section of the tax bill in force from 1916 to 1928), relating to the taxation of water, heat, light and power companies, read in part:

"(5) Railway companies which, in addition to operating a railroad, also sell heat, light or power within this State, shall come within the provisions of this section. The value of the plant of each such company shall be apportioned as between its heating, lighting and power business on the one hand, and its railroad business on the other, upon the basis of its gross receipts from each department, and each such company shall segregate its gross receipts from the sale of heat, light and power from its gross receipts from its railroad, and report its gross receipts from the sale of heat, light and power to the State Corporation Commission, and pay the property and franchise tax as herein provided."

or town may impose a license tax upon such corporation for the privilege of doing business therein, which shall not exceed one-half of one per centum of the gross receipts of such business accruing to such corporation from said business in such city or town; and, provided further, that from the amount of any such license tax there shall be deducted any sum or sums paid by such corporation to such city or town as a merchant's license tax, and license taxes; and provided further, that nothing herein contained shall annul or interfere with or prevent any contract or agreement by ordinance between such corporations and municipalities as to compensation for the use of the streets or alleys of such municipalities by such corporations.

\* \* \* \* \* \* \* \* \* \*

"No State tax, county, city, town, district or road levy shall be laid on the net income of any such corporation, nor shall any county, city, town, district or road levy be laid on the gross receipts of any such company."

In support of his contention that the dividends here in question are exempt from the imposition of an income tax thereon by section 170 and section 177 of the Constitution and the statutes hereinbefore mentioned which were passed in pursuance thereof, the petitioner cites us to the cases cited in footnote 8; and the commonwealth in sup-

---

[8] *Brown* v. *Maryland* (1827), 12 Wheat. 419, 6 L. Ed. 678; *Weston* v. *Charleston* (1829), 2 Pet. 449, 7 L. Ed. 481; *Dobbins* v. *Erie County,* 16 Pet. 435, 10 L. Ed. 1022; *Philadelphia, etc. S. S. Co.* v. *Pennsylvania* (1887), 122 U. S. 326, 7 S. Ct. 1118, 30 L. Ed. 1200; *Pollock* v. *Farmers' Loan & Trust Co.* (1895), 157 U. S. 429, 15 S. Ct. 673, 39 L. Ed. 759; *Evans* v. *Gore* (1920), 253 U. S. 245, 40 S. Ct. 550, 64 L. Ed. 887, 11 A. L. R. 519; *Gillespie* v. *Oklahoma* (1922), 257 U. S. 501, 42 S. Ct. 171, 66 L. Ed. 338; *Mutual Life Ins. Co.* v. *State of Wisconsin,* 276, U. S. 602, 48 S. Ct. 323, 72 L. Ed. 726; *National Life Ins. Co.* v. *U. S.,* 277 U. S. 508, 48 S. Ct. 591, 72 L. Ed. 968; *Miller* v. *City of Milwaukee,* 272 U. S. 713, 47 S. Ct. 280, 71 L. Ed. 487; *Macallen Company* v. *Massachusetts,* 279 U. S. 620, 49 S. Ct. 432, 73 L. Ed. 874, 65 A. L. R. 866; *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 52 S. Ct. 443, 76 L. Ed. 815; *Willcuts* v. *Bunn,* 282 U. S. 216, 51 S. Ct. 125, 75 L. Ed. 304, 71 A. L. R. 1260; *Bachrach* v. *Nelson,* 349 Ill. 579, 182 N. E. 909; *Eliasberg Bros. Merc. Co.* v. *Grimes,* 204 Ala. 492, 86 So. 56, 11 A. L. R. 300; *Hattiesburg Gro. Co.* v. *Robertson,* 126 Miss. 34, 88 So. 4, 25 A. L. R. 748; *Tax Commissioner* v. *Putnam,* 227 Mass. 522, 116 N. E. 904, L. R. A. 1917F, 806.

port of its contention to the contrary cites us to those cited in footnote 9.

None of the cases cited by either party is controlling upon the question here under consideration. The three Virginia cases cited by the Commonwealth have, at best, only a very remote bearing on it; and the excerpts quoted from the opinions therein (see footnote 9) may not properly be construed as an expression (even by way of dictum) of an opinion that an income tax imposed upon income accruing from the ownership or use of property is not a tax upon that property, within the meaning of a constitutional provision providing that such property

[9] *Com.* v. *Werth*, 116 Va. 604, 82 S. E. 695, 696, Ann. Cas. 1916D, 1263, in which the court, holding that the imposition of both a license tax and an income tax upon a lawyer was not such double taxation as is prohibited by the Constitution of Virginia of 1902, said: "The subject matter of schedule D is 'income,' and not the sources from which it is derived."

*Atlantic & Danville Ry. Co.* v. *Southern Ry. Co.*, 149 Va. 701, 141 S. E. 770, 772, in which the court, in passing upon whether the lessee company had contracted to pay the Federal income tax imposed upon the lessor company, said: "The tax so levied [Federal income tax] 'is not similar to other forms of taxation, since it is not imposed upon property or business but upon the proceeds arising therefrom. Black on Income and Other Federal Taxes, section 1. An income tax is an assessment upon the income of the person and not upon any particular property from which that income is derived.' *Young* v. *Illinois Athletic Club*, 310 Ill. 75, 141 N. E. 369, 30 A. L. R. 985."

*Com.* v. *Hannaford*, 159 Va. 84, 165 S. E. 512, in which, upon the authority of *Fox Film Corp.* v. *Doyal*, 286 U. S. 123, 52 S. Ct. 546, 76 L. Ed. 1010 (which overruled *Long* v. *Rockwood*, 277 U. S. 142, 48 S. Ct. 463, 72 L. Ed. 824), the court held: A patent right is not such an instrumentality of the Federal government as to be exempt from State taxation, and, therefore, the proceeds of a sale thereof are Subject to the State income tax. In passing it quoted the language above given from *Atlantic & D. Ry. Co.* v. *So. Ry. Co.*

*Sims* v. *Ahrens*, 167 Ark. 557, 271 S. W. 720, 731, in which the court quotes from section 1 of Black on Income and Other Federal Taxes as follows: "A tax on income is not a tax on property, and a tax on property does not embrace incomes. * * * For the same reason a tax laid on income is different from a tax laid on the property out of which the income arises."

*Featherstone* v. *Norman*, 170 Ga. 370, 153 S. E. 58, 59, 70 A. L. R. 449, in which the court held: "A tax on income is not a tax upon property" under our Constitution.

*Young* v. *Illinois Ath. Club*, 310 Ill. 75, 141 N. E. 369, 30 A. L. R. 985, from which the Commonwealth quotes the language made from it in *Atlantic & D. Ry. Co.* v. *Southern Ry. Co.*, quoted *supra*.

*Hattiesburg Gro. Co.* v. *Robertson*, 126 Miss. 34, 88 So. 4, 5, 25 A. L. R. 748, in which th court said: "The section [section 112 of the Consti-

shall not be taxed, or that a tax imposed thereon shall be in lieu of all other taxes thereon.

The position of the petitioner is that an income tax upon the gross or "net" income accruing from the *mere* ownership, renting, hiring out, or use of property (whether such tax be imposed upon such income as a separate subject of taxation or as a part of the general income of the owner of the property) is a tax upon that property within the meaning of a constitutional provision that such property shall not be taxed, unless by express provision or plain implication a limitation is placed upon the meaning of the words "shall not be taxed." This position finds strong support in the holdings and reasonings of the cases cited by him, and is, we think, well taken.

tution of 1890] contains no language even remotely indicating that its purpose is to withdraw from the legislature the power to tax any species of property or any of the activities of persons who enjoy the protection of the State's laws, but such would be its effect if a tax on the income derived from property should be held to be necessarily a tax on the property from which the income was derived."

*Opinion of the Justices*, 77 N. H. 611, 615, 93 Atl. 311, 313, from which this statement is quoted: "An income tax is generally understood to be a tax at an arbitrary rate—an excise tax. It has even been held not to be a property tax."

*Maxwell* v. *Kent-Coffey Mfg. Co.*, 204 N. C. 365, 168 S. E. 397, 400, 90 A. L. R. 476, in which it was held: "The tax on income, imposed by the revenue acts of this State, is not a tax on property, within the meaning of the requirement of Constitution, art. 5, section 3, that property shall be taxed according to its true value in money."

*State* v. *Frear*, 148 Wis. 456, 134 N. W. 673, 689, 135 N. W. 164, L. R. A. 1915B, 569, 606, Ann. Cas. 1913A, 1147, writ of error dismissed 231 U. S. 616, 34 S. Ct. 272, 58 L. Ed. 400, from which the Commonwealth quotes as follows: "The inapplicability of the rule of the *Pollock Case* [157 U. S. 429, 15 S. Ct. 673, 39 L. Ed. 759] to the case here presented seems so plain as to require little comment. There can be no doubt of the proposition that income taxation of a progressive character, in addition to taxation of property, is directly authorized by the Constitution of Wisconsin as amended in 1908. Words could hardly be plainer to express that idea than the words used. From them it clearly appears that taxation of property and taxation of incomes are recognized as two separate and distinct things in the State Constitution. Both may be levied, and lawfully levied, because the Constitution says so. However philosophical the argument may be that taxation of rents received from property is in effect taxation of the property itself, the people of Wisconsin have said that 'property' means one thing, and 'income' means another; in other words, that income taxation is not property taxation as the words are used in the Constitution of Wisconsin."

The Commonwealth in a way makes the contention that the imposition of an income tax upon income derived from the ownership or use 'of property is not a tax upon that property. But upon analysis its contention is really this: A constitutional provision that a certain class of property "shall not be taxed" should be construed and read as if it were written "shall not be taxed by the imposition of a *property tax* thereon" (using "property tax" as distinguished from a *privilege tax* or an *income tax*), unless there be something which expressly or by implication prevents the giving of this meaning to it. The Constitution of Virginia does not contain anything which expressly or impliedly prevents the words "taxed" and "taxes," as used in the expressions "the shares of stock * * * shall not be further taxed" and "shall be in lieu of all other taxes, or license charges whatsoever upon the * * * shares of stock" in section 170 and section 177 from being construed as so limited. On the contrary there is good ground for implying such a restriction of the words *"taxed"* and "taxes" as used in these sections.

The Commonwealth's contention finds some support in the cases cited by it. But after an examination and analysis of these cases, we think, that it cannot be said with any confidence that any of these courts would, after a careful review of the history of the development of the provisions of the Virginia Constitution and statutes relating to taxation, have held that the word *"taxed"* as here used is expressly or impliedly limited to mean "taxed by the imposition of a *property tax* thereon," or the word "taxes" to mean "property taxes."

Upon principle and reason, applied in the light of the history of the development of the provisions of the Constitution and statutes of Virginia relating to taxation, we are of opinion that the constitutional and statutory provisions relied upon by the petitioner prohibit the taxation in any form or by any device of the shares of stock, and that the imposition of an income tax upon the dividends

paid thereon constitute a tax thereon within the meaning of those prohibitions.

*A tax upon property* and *a property tax* are not co-extensive or synonymous terms, though the one is some-times loosely used for the other. The latter is much more restricted in its meaning than the former. A tax may be, and often is, *a tax upon property* without being *a property tax.*

*A property tax* is a tax assessed against the owner of property upon the basis of the property being in exist- ence and owned by him at the time as of which the tax is assessable.

Property taxes are now generally imposed *ad valorem;* but they may be imposed upon other bases, as for in-stance per unit of property[10] or according to the income productivity of the property.[11] The measure of a tax is not the ultimate determinant of whether it is a "property tax" or some other form of tax. A property tax, a privi-lege tax, and an income tax may all be determined in exactly the same way, yet be as distinctively property, privilege and income taxes as if the property tax were imposed upon the value of the property, the privilege tax upon an arbitrary basis, and the income tax upon either actual gross or so called "net" income. On the other hand a privilege tax or an income tax may be as essentially a

---

[10] Up until the Constitution of 1850 (which was ratified and adopted at an election held the fourth Thursday in October, 1851) became effective, horses and mules were taxed in Virginia per head regard-less of their value. Acts 1850-51, p. 4, and prior acts.

[11] From 1786 until the Constitution of 1850 became effective im-proved lots in cities and towns occupied by the owners or rented out, were taxed according to their "yearly rental or annual value." Act of October, 1786 (12 Hen. St. at L., p. 283) ; Acts 1850-51, p. 3; and intervening revenue acts.

Section 6 of the Act of 1786 read: "* * * instead of the tax now paid upon houses and lots in town * *. * there shall be paid on every such lot and house, five pounds in the hundred upon the amount of the rent of each house and lot respectively; the amount of the said rent, where any such house or lot is leased, to be ascertained by the rent paid by the tenant, and where such house and lot is in the occu-pancy of the proprietor, the yearly rent or value shall be ascertained by the commissioners * * * by a comparison of its value with other houses or lots actually rented."

tax on certain property as a property tax imposed upon the owner on account thereof.

A *"privilege tax"*[12] is a tax levied upon a person, natural or artificial, for the privilege of doing something, or of having and/or exercising some right or franchise[13] granted by the State, or a political subdivision thereof. Where the right to do a thing or to have or exercise a right or franchise granted by the State is made dependent upon or subject to a charge *for the doing, having or exercising of it,* the tax is a privilege tax. This is true whether the tax be assessable and/or payable before or after the period for which it is exacted, and regardless of the basis upon which it is imposed. It is not *a property tax,* but it may be, and often is, *a tax upon property.* To use a rather inelegant example because it is so excellently exemplified by the Virginia statutes,[14] a tax for a license to stand a specified jackass is plainly a tax upon that jackass.

The truth that a privilege tax may be, and is in many instances, a tax upon property also finds recognition in

[12] We are here speaking of privilege taxes imposed for the purpose of revenue, and not fees imposed merely in the exercise of the police power for the purpose of regulation, as for instance, a reasonable inspection charge to pay the cost of an inspection which is provided for in the exercise of the police power. See 1 Cooley, Taxation (4th Ed.) section 27-29.

[13] In dealing with franchise taxes it is to be borne in mind that a franchise is property, and also that the existence and ownership of a franchise in some cases (as in the case of a railroad company) may, and usually does, give to the physical properties of the owner an added value which they do not possess in and of themselves.

[14] From as early as 1782 until 1849, the provisions of the revenue acts relating to the taxation of horses, mules, etc. (except as to the amount), were essentially the same as the provision of the act of March 31, 1848, which provided: "The public taxes * * * shall be as follows: * * * for every stallion or jackass, twice the price at which such stallion or jackass covers a mare by the season; * * * provided, * * * that not less than six dollars shall be paid on every stallion or jackass let to mares; for all other horses, mares, asses, mules, and colts, ten cents each." 11 Hen. St. at L., p. 112, p. 113; Acts 1847-48, p. 3; and intervening revenue acts.

In the act of March 2, 1849 (Acts 1849-50, p. 3), the provisions relating to the taxation of such animals were changed to read: "The public taxes * * * shall be as follows: * * * On every horse, mare, mule, ass or colt [except stallions or jacks covering mares for compensation], ten cents. * * * On a license permitting a stallion or jack to cover mares for compensation twice the price at which such stal-

section 25, art. 4, Constitution of 1850;[15] in the provision of section 170, Constitution of 1902 (which has not been amended), which provides that the General Assembly "in imposing a franchise tax may, in its discretion, make the same in lieu of taxes upon other property, in whole or in part, of a transportation, industrial or commercial corporation;" in what was section 173, ch. 72, Acts 1870-71, p. 120, which with some amendments is now section 149 of the Tax Code of Virginia (section 149, ch. 45, Acts 1928, p. 101)[16] and in the long-existing provision of section 188 of the Tax Code (section 188, ch. 45, Acts 1928, p. 120), which provides that the merchant's license tax thereby imposed "shall be in lieu of all taxes for State purposes on the capital actually employed by said merchants * * * in said business, * * *."

An *income tax* is a tax imposed upon income received by or accrued to a person, natural or artificial, during a

---

lion or jack covers a mare by the season * * *; provided, that no stallion or jack shall pay a tax of less than six dollars."

Section 22, art. 4, of Virginia Constitution of 1850, provided: "Taxation shall be equal and uniform throughout the Commonwealth, and all property other than slaves shall be taxed in proportion to its value, which shall be ascertained in such manner as may be prescribed by law." At the first session of the General Assembly which convened after the Constitution of 1850 became effective, the statute was changed so as to impose both an *ad valorem* property tax and a license tax on stallions and jacks. Acts 1852, ch. 1, section 7, p. 8, and ch. 17, section 12, p. 17.

[15] Section 25, art. 4, Constitution Va. 1850: "The General Assembly may levy a tax on incomes, salaries, and licenses; but no tax shall be levied on property from which any income so taxed is derived, or on the capital invested in the trade or business in respect to which the license so taxed is issued."

[16] Section 173, ch. 72, Acts 1870-71, p. 120, which read: "A license shall not be construed to exempt from taxation the property used in the licensed business, nor the profits of such business." This section was carried verbatim into the Code of 1887 as section 564. By Acts of 1916, ch. 302, p. 521, it was amended to read as follows, and as so amended was carried verbatim into the Code of 1919 as section 2382:

"A license shall not be construed to exempt from taxation the tangible property used in the licensed business nor the profits or income of such business."

In the enactment of the Tax Code of 1928, it was again amended and carried into the Tax Code as section 149, which reads:

"A license shall not be construed to exempt from taxation the property used in the licensed business nor the profits or income of such business, unless specifically so provided by law."

definite period regardless of whether the property which constituted the income is existent and owned by the recipient at the time as of which the tax is assessable or not, and without the income being used as a factor to determine the amount of *a property tax*[17] or as a yardstick by which to graduate or determine the amount of a *privilege tax*.[18]

"Net income" as used with reference to taxation is more accurately defined as "gross income less deductions authorized by statute." Perhaps there have been and may be some statutes imposing a tax on true net income; but such a statute is indeed a rare bird. While an *income* tax upon the *accessions*[19] arising from the bare use or

[17] For an example of income used as a factor for the determination of a property tax, see note 11 and the revenue acts which from 1843 to 1870 imposed a property tax upon toll bridges and ferries of a named percentage of their "yearly rent or value"; Acts 1842-43, ch. 1, section 6, p. 7; Acts 1867-68, ch. 64, section 6 (Schedule C), p. 861; and the revenue acts of intervening years. The act of June 29, 1870, Acts 1869-70, ch. 189, section 15 (Schedule C), p. 294, changed the law so as to provide for the assessment and taxation of toll bridges and ferries according to their value determined "by reference to the yearly rent, if rented; (and) if not rented * * * from the yearly value."

[18] The license tax imposed upon telegraph companies by the Revenue Act of 1890 (Acts 1889-90, ch. 244, section 25, p. 212) is an example of a privilege tax measured by gross income as a yardstick. It forbade a telegraph company from doing business in Virginia without procuring a license to do such business, fixed the penalty for doing so at not less than $400 for each offense, and imposed a license tax of "$250 and an additional charge of one per centum of the gross earnings * * * from their business in this State during the year preceding."

The Massachusetts statute (G. L. ch. 63, section 32, as amended by St. 1923, ch. 424, section 1) which the court had under consideration in *Macallen Co. v. Massachusetts*, 279 U. S. 620, 49 S. Ct. 432, 73 L. Ed. 874, 65 A. L. R. 866, presents an example of a privilege tax measured in part by a tax on *net income* as defined in that statute. It provided that "every * * * business corporation shall pay annually, with respect to the carrying on or doing of the business by it, an excise equal to the sum of the following, * * *:

"(1) An amount equal to five dollars per thousand upon the value of its corporate excess.

"(2) An amount equal to two and one-half per cent of that part of its net income, as defined in this chapter, which is derived from business carried on within the Commonwealth."

[19] By accessions we mean rents from real estate, interest on bonds, dividends on shares of stock, etc. It is too manifest to require comment that to the extent that the income upon which a tax is laid includes the difference between the purchase and selling price of a piece of property (real or personal) it is a tax upon that property.

ownership of property or the performance or utilization of labor (physical or mental) is not a property tax or a privilege tax, it is a tax upon that property, or that labor.

The right of a person, natural or artificial, to take the income accruing from the use of his property in a way which the legislature may not prohibit him from using it, or from the application of his labor (physical or mental) in a way which the legislature may not prohibit him from applying it, or from the doing of a business which the legislature may not prohibit him from doing, is an inherent incident of his ownership of the property,[20] or of his right to labor, or of his right to do the business, and is protected and guaranteed to him as such incident by section 1 of the present and every preceding Constitution of Virginia.[21]

Where not prohibited by the Constitution of the Commonwealth or that of the United States, the legislature has the power to tax a person's property, his labor, or the business done by him, either by taxing it or any incident of it. But no amount of specious argument or legal legerdermain can do more than thinly disguise the truth that a tax upon any inherent incident of a person's property, labor, or the business done by him is a tax upon that property, that labor, or that business, as the case may be.

Were the Constitution to provide that a man's labor

[20] "As according to the feudal law, the whole beneficial interest in the land consisted in the right to take the rents and profits, the general rule has always been, in the language of Coke, that 'if a man seized of land in fee by his deed granteth to another the profits of those lands, to have and to hold to him and his heirs, and maketh livery *secundum formam chartae,* the whole land itself doth pass. For what is the land but the profits thereof?' Co. Litt. 45. And that a devise of the rents and profits or of the income of lands passes the land itself both at law and in equity. 1 Jarm. on Wills (5th Ed.) 798, and cases cited." *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429, 580, 15 S. Ct. 673, 689, 39 L. Ed. 759.

[21] This section, which is section 1 of the Bill of Rights of 1776 verbatim, provides: "All men are by nature equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety."

shall be exempt from taxation (without qualifying the word tax), could a court, without disregard of the truth, hold that the imposition upon a person of a license to labor or for the privilege of laboring, or the imposition of a tax upon him assessed upon the basis of the income produced for him by his labor, was not a tax upon his labor? Or, were the Constitution to provide (without qualification) that, when a tax was imposed upon a person for a license to labor, his labor "shall not be further taxed," or such license tax "shall be in lieu of all other taxes" upon his labor, and the legislature to impose a tax on him assessed upon the income gross or net, produced for him by his labor, could a court conceal from itself the truth that his labor was thereby "further taxed" or subjected to "another tax?"

While perhaps they are not the only conceivable ways of taxing a man's labor, but certainly the most convenient, common and obvious ways of doing so are to impose a tax upon him for the privilege of laboring, or to impose a tax on him based upon the income it produces for him.

Many businesses cannot be conveniently or adequately taxed by the *ad valorem* system. The Constitutions of Virginia of 1870 (section 4, art. 10) and of 1902 (section 170) recognize this, and authorize the imposition of a license tax "upon any business which cannot be reached by the *ad valorem* system." In so doing they give vocal recognition to the fact that such taxes are taxes "upon the business," and that, though these license taxes may be graduated according to gross receipts, gross earnings, or gross sales, they are not merely taxes upon the receipts or sales. Were the Constitution also to provide that some specific business shall not be taxed and the legislature to impose a tax upon the doer of that business for the privilege of doing it, upon what theory could it be held that it had not taxed that business?

A tax upon the doer of a business based, computed, or assessable upon the income, gross or net, produced by the business is, if anything, even more obviously a tax upon

the business than a tax upon the privilege of doing that business. Were the Constitution to provide that where a license tax is imposed for the privilege of doing a business, such business "shall not be further taxed," or that such tax "shall be in lieu of all other taxes" on that business (without qualifying the word *taxed* or *taxes*) upon what theory, not based upon a palpable fiction, could it be held that a tax laid upon the doer of that business based, computed, or assessed upon the income (gross or net) produced by that business was not a tax thereon and prohibited by the Constitution?

The Supreme Court of Appeals of Virginia pointedly recognized in *Com.* v. *Maury* (1887), 82 Va. 883, 1. S. E. 185, 188, that a tax upon the privilege of selling property is a tax upon that property.

In 1871 the General Assembly passed an act (Acts 1870-71, ch. 282, p. 378) for funding the State debt, and provided that the coupons attached to the bonds issued thereunder "shall be receivable at and after maturity for all taxes, debts, dues and demands due the State, which shall be so expressed on their face." Having repented of having authorized and issued bonds with tax-receivable coupons, it enacted section 65 of the General Revenue Act of March 15, 1884 (Acts 1883-84, ch. 450, p. 561), which read: "No person shall sell tax-receivable coupons from bonds of the State of Virginia, without a special license, for which privilege he shall pay $1,000 for each office or place of business kept for that purpose. In addition thereto, he shall pay to the State a tax of twenty per centum upon the face value of all tax-receivable coupons sold by him."

R. L. Maury was indicted under this act for selling without a license coupons cut from bonds issued under the Funding Act of 1871. On July 21, 1884, the Hustings Court of the city of Richmond sustained a motion to quash the indictment on the ground that *quoad* these bonds section 65 of the act of 1884 was repugnant to both the State and Federal Constitutions. To this judgment the Commonwealth was granted a writ of error by this court. In an

opinion written by Richardson, J., the court held that, inasmuch as the Funding Act of 1871 did not exempt the bonds issued thereunder or the coupons thereto attached from taxation, section 65 of the Act of 1884 did not violate the contract between the Commonwealth and the holders of the bonds or of coupons cut therefrom, and was not unconstitutional. But in its opinion the court accepted it as unquestionably true that a tax on the business of selling property is a tax on the property itself, and if the property be non-taxable, no tax can be imposed upon the business of selling it. The court said: "Then, what though the tax imposed on the business of selling the coupons be a tax on the coupons themselves? * * *

"True it is, that these authorities [*Welton* v. *State of Missouri,* 1 Otto, 91 U. S. 275, 23 L. Ed. 347; *Webber* v. *Virginia,* 13 Otto, 103 U. S. 344, 350, 26 L. Ed. 565; *Murray* v. *Charleston,* 90 U. S. 432, 24 L. Ed. 760; and other cases cited by Maury] do establish the proposition that a tax on the business of selling an article is a tax on the article itself, and that, therefore, a tax imposed on the sale of a *non-taxable* article is unconstitutional and void. But that proposition is not denied. In fact, it is a *concessum* in this opinion and is perfectly consistent with the views herein presented and with the conclusion arrived at."[22]

In *Brown* v. *Maryland* (1827), 12 Wheat. 419, 444, 6 L. Ed. 678, speaking with reference to a license tax imposed under the State authority for the privilege of selling imported articles, Chief Justice Marshall said: "All must

[22] This case was not appealed, to the Supreme Court of the United States. But *Cuthbut* v. *Com.* (1889) 85 Va. 899, 9 S. E. 16, which presented the same facts and was decided against Cuthbert with the statement that it was "ruled by the case of *Com.* v. *Maury*," was appealed. In *Cuthbert* v. *Virginia* (1890), 135 U. S. 662, 10 S. Ct. 972, 34 L. Ed. 304, the Supreme Court of the United States reversed the judgment of the Virginia court. The ground upon which it reversed the judgment was that license required by section 65 of the Tax Act of March 15, 1884, was unconstitutional, because it placed an undue restraint on the negotiability of the coupons, and therefore violated the contract between the Commonwealth and the bondholders. The coupons sold were cut from bonds issued under the Refunding Act of 1871, and, therefore, the question of whether such a license tax constituted a tax upon tax-exempt bonds was not adverted to by the court.

perceive, that a tax on the sale of an article, imported only for sale, is a tax on the article itself." It is no less true, we think, that all must perceive that, though not a *property tax,* a tax upon the gross or "net" income or accessions derived from the bare beneficial ownership or use of property (real or personal, tangible or intangible) is a tax upon that property. That this is a fact has received recognition many times in the statutory and constitutional provisions of this Commonwealth.

Particularly is it to be noted that the history of section 170 of the present Constitution shows that it constitutes a clear recognition of this fact. This history of this section traces back through art. 10, section 4, of the Constitution of 1870, to art. 4, section 25, of the Constitution of 1850, which has been quoted in footnote 15, *ante.* When the subject is examined in the light of the lack of prior constitutional restrictions upon the power of the General Assembly to tax and of the tax statutes prior to 1850, this is plain. It was provided in section 22, art. 4, of the Constitution of 1850, for the first time that, "Taxation shall be equal and uniform throughout the Commonwealth, and all property other than slaves shall be taxed in proportion to its value." Recognizing that a tax upon income from property is a tax upon that property, that this was the only way in which some property (notably notes, bonds and other evidences of debt) had ever been taxed in Virginia, and that the requirement that all property (other than slaves) be taxed in proportion to its value inhibited the imposition of a tax upon the income from property, unless this requirement was qualified, the convention recognized that a provision such as section 22 of art. 4 would have to be inserted to permit income from property to be taxed in any case. But though it provided that notwithstanding the provision that all property should be taxed according to its value, "the General Assembly may levy a tax on incomes, salaries and licenses," it gave further recognition and application to the principle that a tax upon the income from or for the privilege

of selling or using property is a tax upon that property by providing "but no tax shall be levied on property from which any income so taxed is derived, or on the capital invested in the trade or business in which the license so taxed is issued."

This section (section 170) cannot properly be interpreted as meaning that "taxation of property and taxation of income are recognized as two separate and distinct things in the State Constitution," in the sense that in *State* v. *Frear* (cited *supra* in note 9) the Wisconsin court held a provision of the Wisconsin Constitution to be.

In *Pollock* v. *Farmers' Loan & Trust Co.* (April, 1895), 157 U. S. 429, 15 S. Ct. 673, 689, 39 L. Ed. 759, the Supreme Court of the United States held that the Federal "net" income tax act passed in 1894 was unconstitutional for two reasons: (1) In imposing a tax on the income of rents from real estate it imposed a tax upon the real estate itself, and it is therefore a direct tax which is void because in violation of art. 1, section 2 of the Constitution of the United States, requiring that "representatives and direct taxes" shall be apportioned among the States according to population. (2) In so far as it imposed a tax upon the income received from municipal bonds it is invalid "because it is a tax upon the power of the States, and on their municipalities to borrow money.[23] And upon the

---

[23] In the course of the majority opinion, delivered by Mr. Chief Justice Fuller, the court said:

"* * * it is conceded in all these cases, from that of Hylton (*Hylton* v. *U. S.* (1796), 3 Dall. 171 [1 L. Ed. 556]) to that of Springer (*Springer* v. *U. S.* (1880), 102 U. S. 586 [26 L. Ed. 253], that taxes on land are direct taxes, and in none of them is it determined that taxes on rents or income derived from land are not taxes on land.

"* * * it has always been considered that a tax upon real estate *eo nomine* or upon its owners in respect thereof is a direct tax within the meaning of the Constitution. But is there any distinction between the real estate itself or its owners in respect of it and the rents or income of the real estate coming to the owners as the natural and ordinary incident of their ownership?

"If the Constitution had provided that Congress should not levy any tax upon the real estate of any citizen of any State, could it be contended that Congress could put an annual tax * * * upon the rent or income of the real estate? And if, as the Constitution now reads, no unapportioned tax can be imposed upon real estate, can Congress

rehearing (158 U. S. 601, 15 S. Ct. 912, 917, 39 L. Ed. 1108) the court also plainly held that a tax imposed upon the income derived from personal property is a tax upon the property, and, therefore, direct tax within the meaning of art. 1, section 2 of the Constitution. After having referred to its holding and reasoning in the original opinion as to the income tax being invalid in so far as it was imposed upon the rents from real estate, the court said upon the rehearing:

"Nor can we perceive any ground why the same reasoning does not apply to capital in personalty held for the purpose of income or ordinarily yielding income, and to the income therefrom.

"* * * if the revenue derived from municipal bonds cannot be taxed because the source cannot be, the same rule

without apportionment nevertheless impose taxes upon such real estate under the guise of an annual tax upon its rents or income?

"* * * it is admitted that a tax on real estate is a direct tax. Unless, therefore, a tax upon rents or income issuing out of lands is intrinsically so different from a tax on the land itself that it belongs to a wholly different class of taxes, such taxes must be regarded as falling within the same category as a tax on real estate *eo nomine*. The name of the tax is unimportant. The real question is, is there any basis upon which to rest the contention that real estate belongs to one of the two great classes of taxes, and the rent or income which is the incident of its ownership belongs to the other? We are unable to perceive any ground for the alleged distinction. An annual tax upon the annual user or annual user of real estate appears to us the same in substance as an annual tax on the real estate, which would be paid out of the rent or income. This law takes the income received from land and the growth or produce of the land.

"* * * It is the substance and not the form which controls, * * *. Thus in *Brown* v. *Maryland*, 12 Wheat. 419, 444 [6 L. Ed. 678], it was held that the tax on the occupation of an importer was the same as a tax on imports and therefore void. And Chief Justice Marshall said: 'It is impossible to conceal from ourselves, that this is varying the form, without varying the substance. * * * All must perceive that a tax on the sale of an article, imported only for sale, is a tax on the article itself.'

"In *Weston* v. *Charleston*, 2 Pet. 449 [7 L. Ed. 481], it was held that a tax on the income of United States securities was a tax on the securities themselves, and equally inadmissible. * * * but the opinions of Mr. Justice Thompson and Mr. Justice Johnson, who dissented, make it clear that the levy was upon the interest of the bonds and not upon the bonds, and they held that it was an income tax, and as such sustainable; but the majority of the court, Chief Justice Marshall delivered the opinion, overruled that contention."

applies to revenue from any other source not subject to the tax; and the lack of power to levy any but an apportioned tax on real and personal property equally exists as to the revenue therefrom."

It seems plain to us that to impose a tax upon the dividends received thereon by the owner of a share of stock is to tax the share of stock; and that the Constitution of Virginia prohibits the imposition of a tax upon the divi-. dend received upon the shares of stock here in issue unless one of two things can be said to be true: (1) Unless the Constitution contains language which expressly or by reasonable implication limits the meaning of the words "taxed" and "taxes" as used in the expressions "the shares of stock * * * shall not be further taxed" and "in lieu of all other taxes, or license charges whatsoever upon * * * the shares of stock issued by it," in section 170 and section 177 of the Constitution, to the meaning "taxed by the imposition thereon of property taxes" and "property taxes" respectively; or (2) unless it expressly or by reasonable implication authorizes the imposition of an income tax upon the shares of stock issued by the companies mentioned in these sections, notwithstanding the provisions of these sections.

An examination of the Constitution discloses no language which we think can be said to do *expressly* either of these things. When we examine the Constitution without reference to its historical background, we find no language which we think can be said to do either of them by reasonable implication. On the contrary, when all the sections of the Constitution relating to taxation are read together, they afford strong internal evidence that it was not intended that the meaning of the words "taxed" and "taxes" should be so limited or to authorize the imposition of an income tax upon the dividends from such shares of stock. Among these internal evidences are the following:

Apparently the convention of 1902 recognized that the immunity from further taxes provided by the capitalized

words in section 177 embraced immunity from taxes other than "property taxes." So broad did it understand the meaning of "taxes" to be, that it felt it necessary expressly to except the following from the taxes from which railway and canal companies shall be immune: (a) The annual fee provided for in section 157 (see note 6); (b) assessments authorized in section 170 for public improvements; and (c) charges agreed upon between a street railway company and a municipality for the use of its streets, which is in its essence a privilege tax. According to the commonly accepted rule of construction, the making of these exceptions is indicative of an intention that the expression "shall be in lieu of all other taxes" shall exclude all forms of taxation other than those mentioned.[24]

Section 183 provides that, "unless otherwise provided in this Constitution, the following property and no other shall be exempt from taxation, State and local, including inheritance taxes;" and "except as to class (a) above, general laws may be enacted restricting but not extending the above exemptions."[25] It would seem to be plain that

[24] The plaintiff in error also makes this contention: Section 177 does not except "net income" taxes from the taxes from which railway companies shall be immune. The provisions of section 216 and section 229 of the Tax Code expressly prohibit the imposition of a tax on the net income of the corporations therein mentioned; and section 52 of the Tax Code expressly excepts from corporations subject to a net income tax "public service corporations which are subject to a State franchise tax or license tax upon gross receipts." The exception by the General Assembly of such companies from corporations subject to a State income tax is a recognition of the fact that section 170 and section 177 of the Constitution prohibit the imposition of a tax on their net income.

So far as railroad companies are concerned, this contention has no merit in it. When the earlier statutes from which these sections of the Tax Code are taken were enacted and when these sections of the Tax Code were enacted, section 176 of the Constitution provided that "no tax shall be laid upon the net income of such, [i. e., railway and canal] corporations." (Matter in brackets ours.) While the amendment to section 176 omitting these words had been proposed when the Tax Code of 1928 was enacted, it had not been ratified at that time.

We are not called on to pass upon and do not pass upon what effect this amendment of section 176 had upon the power of the General Assembly to impose both a franchise tax and a net income tax upon railway and canal companies.

[25] For further quotations from section 183, see note 5.

the intendment of this section is that the exemption from taxation of the property mentioned in section 183 (which includes State and municipal bonds and the real estate and endowment funds of non-profit educational institutions) extends as well to an exemption of the income derived from such property as to the exemption of the property from the imposition thereon of a "property tax." This is the construction which the General Assembly appears to have placed upon this section; for it has never, so far as we can ascertain, imposed a tax upon the income received from such property. (See section 52 of the Tax Code.)

Section 171 of the Constitution was amended in 1928 so as to provide a self-executing provision segregating real estate and tangible personal property for local taxation. But the language of the amendment is not "No tax for State purposes shall be levied," but is *"No * * * property tax* for State purposes shall be levied." The draftsman of the amendment and the General Assemblies proposing it appear to have understood and recognized the difference in the scope of the term "property tax" and the terms "tax" or "tax upon property," and purposely have chosen this language to limit the prohibition against State taxation to a prohibition against the imposition only of "property taxes" without prohibiting the taxation by the State of the income therefrom.

The meaning of a constitutional or statutory provision is to be determined as of the time it is ordained or enacted. Words used therein are to be understood as being used in their then accepted or understood meaning. To correctly interpret the expressions in section 170 and section 177 of the Constitution of 1902, which are here under consideration, it is proper that we place ourselves as nearly as we can in the shoes of the convention which framed and proclaimed the Constitution. It is reasonable to assume that the members of that convention (or at least those composing the committee on finance and taxation) were to a measurable degree familiar with the prior constitu-

tional and statutory provisions relating to these subjects; and chose the words used in the light of this knowledge.

When we examine section 170 and section 177 in the light of statutory and constitutional provisions from 1786 to 1902 relating to taxation, we think it is very plain that the expression in section 170 "the shares of stock issued by any such corporation, shall not be further taxed" and the expression "shall be in lieu of all other taxes, or license charges whatsoever upon * * * the shares of stock issued by it" were used with the meaning that the shares of stock shall not be further taxed, either by the imposition of a property tax thereon or by any other form of taxation, as for instance, a tax upon the dividends received thereon.

The contention of the Commonwealth that the construction now placed by it upon the expressions in section 170 and section 177 of the Constitution here in question has become fixed and settled by practical construction and is now binding, is not supported by the record or our examination of the Virginia statutes enacted since 1902.

Upon examination of these statutes we do not find that they show that the General Assembly has enacted any statute which can properly be said to be an adoption of this construction. Nor is there any evidence in the record which tends to show that prior to 1920 any person charged with the construction or administration of the tax laws ever construed these sections as not prohibiting the imposition of an income tax upon the dividends received from such corporations or assessed such dividends with an income tax.

In support of its contention and as evidence of the fact that this has been the construction heretofore placed upon section 170 and section 177 by the officers of the State government charged with the administration of its tax laws, the Commonwealth cites us to two opinions of the Attorney-General of Virginia. One of these, dated October 28, 1920, is addressed to Mr. William Pratt, Chairman of the Board of Review, Staunton Virginia (Am. Rep.

Atty. Gen. 1920, p. 319). In it he expresses his opinion that dividends received on shares of stock of railroad companies are subject to the State income tax, and says that counsel for the State Tax Board concurs in this view. The other is dated February 18, 1922, and is addressed to Robert K. Brock, Examiner of Records, Farmville, Virginia (Am. Rep. Atty. Gen. 1922, p. 330). In it he says that he concurs in the "opinion of the State Tax Board" that dividends on shares of stock issued by public service corporations, including railway and water, heat, light and power companies, are subject to the State income tax. Both opinions are brief, and neither sets forth the reasons for the opinion expressed or shows that the Attorney-General's attention was called or directed to the provisions of section 170 or section 177 of the Constitution. They are wholly insufficient to establish any long-continued, consistent administrative construction which can be said to have given such a construction binding force. Even if these letters of the Attorney-General can be deemed a practical construction of these sections of the Constitution, there is no evidence in this record that such construction has since been consistently applied by the governmental officials charged with the administration of the tax laws.

For the above reasons we think that the judgment of the trial court should be reversed and judgment entered for plaintiff in error.